Exhibit A to RREF's Amended Motion for
Appointment of a Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ENTERED ON DOCKET
9/22/98
D,DA

| | |
|---|---|
| IN RE | CASE NUMBER |
| INTERNATIONAL REALTY DEVELOPMENT PARTNERS, LTD., | |
| Debtor. | |
| SOUTH HENRY DEVELOPMENT COMPANY, LLC, MICHAEL R. CRACE, MILLICHAP DEVELOPMENT GROUP, LLC, and MOORE & CUBBEDGE, LLP | A98-63901-ADK |
| Movants, | |
| v. | |
| INTERNATIONAL REALTY DEVELOPMENT PARTNERS, LTD., | IN PROCEEDINGS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE |
| Respondent. | |

### ORDER

The above-styled case is before the Court for approval of the Debtor's disclosure statement and on the Movant's motion for reconversion of the case to Chapter 7, or, in the alternate, the appointment of a Chapter 11 Trustee. For the reasons set forth below, the disclosure statement is disapproved, and a Chapter 11 Trustee will be appointed.

#### Facts and Procedural History

The Debtor is a limited liability company run by Ms. Barbara Stam, who is also the Debtor's primary owner. The Debtor owns two assets, both of which are pieces of real property in Henry County, Georgia. Neither property is developed, and neither provides income other than potential income resulting from the sale of hunting rights and timber. The Debtor acquired

93

the larger and more valuable piece of property, referred to as the "Southgate property," in 1995. The seller, an entity known as the Connell Group, financed the purchase. That note and mortgage were subsequently acquired by Killearn, Inc., which now holds them. The Debtor owns a second piece of real property, known as the "Brownstone" property. Brownstone Partners, LLC holds a security interest in this property. Neither property has been subjected to a valuation in this Court, though all parties seem to agree that the secured lenders are oversecured.

During 1996, the Debtor entered into a joint venture with South Henry Development Company (hereinafter "South Henry"), by which South Henry agreed to take certain actions to develop the Southgate property. To fund development costs, the Debtor borrowed $500,000.00 from RJM Group, Inc. (hereinafter "RJM"), which now holds a second mortgage on the property in that principal amount. In August 1997, the Debtor concluded that South Henry was not performing as required under the joint venture agreement, and repudiated that agreement. The Debtor then entered into a similar agreement with Killearn Properties, Inc. On August 29, 1997, South Henry filed suit for breach of contract in the Superior Court of Cobb County, Georgia, and the Debtor counterclaimed for damages. The Debtor removed the suit to the Bankruptcy Court. In November 1997, Killearn Properties, Inc. of Georgia, a company related to Killearn Properties, Inc., acquired the Connell note that originally funded the purchase of the property. Killearn, Inc., another company related to Killearn Properties, Inc., now holds the note and mortgage on the property.

On March 2, 1998, after RJM initiated foreclosure proceedings, the Debtor filed for relief under Chapter 7. The Chapter 7 Trustee arranged for a sale of the property for $5,500,000.00. On May 21, 1998, the Debtor filed for approval of new counsel, and new

2

counsel filed a motion to convert the case to Chapter 11. The Court granted the motion for conversion of the case on May 26, 1998, which aborted the proposed sale of the property. On June 5, 1998, South Henry, together with related parties, filed a motion to reconvert the case to Chapter 7, or, in the alternative, to appoint a Chapter 11 Trustee. South Henry alleged that the Debtor had acted in bad faith in converting its case and that South Henry was prejudiced resulting from the diminution of the estate as interest on secured claims ran. The Debtor was ordered to file a plan and disclosure statement by July 17, 1998, and the hearing on the motion to reconvert was continued, to be heard at the same time as the hearing on the disclosure statement.

On July 17, 1998, the Debtor filed a plan and disclosure statement that proposed a joint venture between the Debtor and Newland Associates, Inc. (hereinafter "Newland") to fund the plan. A hearing on the disclosure statement and on South Henry's motion to reconvert was scheduled for August 27, 1998. All the secured creditors and South Henry objected to the disclosure statement. The Debtor filed an amended plan and disclosure statement on the day of the hearing that purported to address the objections of the Creditors. The Creditors maintained their objections to the amended plan. South Henry argued that the Plan is neither feasible nor confirmable and requested that the case be reconverted to Chapter 7, or, in the alternative, that a Chapter 11 Trustee be appointed.

### Discussion

#### A. Debtor's Disclosure Statement and Plan

The Debtor's proposed plan essentially posits that the Debtor will enter into a joint venture agreement with Newland to develop the two properties. The joint venture will execute several notes in favor of the Debtor, to be paid largely in one or two years after issuance. The proceeds from these notes will be used to pay the Creditors. The joint venture requires Newland

3

to find a source of funding by October 31, 1998. Ms. Stam and the other owners will retain their equity interests in the Debtor, but are not contributing further capital to the Debtor.

"A court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies the disclosure statement is not confirmable." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). Section 1129(a) of the Bankruptcy Code sets forth requirements for confirmation of a Plan. The Code requires that the plan must be feasible, that is, confirmation of the plan must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." 11 U.S.C. § 1129(a)(11). To be feasible, the Plan must offer more than speculation and visionary schemes with little likelihood of success. *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003-04 (E.D. Va. 1994). The Debtor has the burden of proving the feasibility of the Plan. *See Affiliated Nat'l Bank--Englewood v. TMA Assocs., Ltd. (In re TMA Assocs., Ltd.)*, 160 B.R. 172, 177 (D.Colo. 1993).

The ultimate source of the funding for repayment of the notes is not clear from the Debtor's Plan. It is not specified whether the repayment will issue from the funds provided by the unidentified funding source that Newland has agreed to locate by October 31, 1998, or whether the notes are to be repaid out of the proceeds of the development of the property.

If the repayment of the notes will be provided from the funding source, the Plan does not provide adequate details about the source and the terms of the funding. First, the funding source is currently purely hypothetical. The Debtor failed to identify even a potential source of funds. A plan may be rejected where "[t]here is no credible evidence concerning potential sources for refinancing . . . ." *In re Haardt*, 65 B.R. 697, 702 (Bankr. E.D. Pa. 1986); *see also Walker*, 165 B.R. at 1004-05 (a plan proposing to sell real estate must identify the buyer). Additionally, the terms of the financing are not known. *See Walker*, 165 B.R. at 1004-05. The

4

Debtor claims the risk of default is low, but the Court cannot assess that without the identity of the funding source. Consequently, if the funding source is to provide the funds for the repayment of the Creditors, the Court finds that the Plan is too speculative for failing to identify the source and the terms of the funding.

It seems more likely that the Debtor intends to use the proceeds from the development of the properties to fund the Plan. Such a source of funds is even more speculative than the hypothetical capitalist. The Debtor has provided no facts whatsoever about the plans to develop the property. There has been no evidence of the value of the property, once it has been developed. *See Haardt*, 65 B.R. at 702. Further, although the Plan represents that the property will be a "mixed use" residential and commercial property, it appears that Newland has not yet formulated plans to develop the property. The Debtor provided no projections or pro forma statements to show that the income from the venture will cover the notes. Consequently, the Plan is based on nothing more the than "highly conjectural and optimistic hope" that the development of the property will generate enough proceeds to pay the notes. *In re Stuart Motel, Inc.*, 8 B.R. 48, 49 (Bankr. S.D. Fla. 1980). Furthermore, the Debtor, in the two years preceding its bankruptcy, participated in two joint ventures to develop this property. The Debtor has not shown why its current effort will succeed where others have failed. *See Haardt*, 65 B.R. at 702 (finding plan not feasible where the Debtor proposed to refinance within a short time, but had been unable to procure refinancing for two years).

Additionally, the Plan is not confirmable because it violates the absolute priority rule. Several classes of creditors, all of which appear to be impaired, have indicated their intention to reject the Plan. Under § 1129, acceptance by an impaired class is required to confirm the Plan, unless certain criteria have been met. Those criteria, found in the "cram down" provision of

5

AO 72A
(Rev.8/82)

§ 1129(b), require, inter alia, that, unless unsecured creditors receive property of a value equal to the amount of their claims, the holder of any junior claim or interest may not receive or retain any property. § 1129(b)(2)(B). This requirement, the "absolute priority" rule, mandates that a plan may not provide for retention of equity by equity holders when the senior unsecured creditors do not receive property of a value equal to their claims. *Norwest Bank Worthington v. Ahlers*, 108 S.Ct. 963, 965-66 (1988). The liquidation analysis provided by the Debtor in its modification of its amended disclosure statement, filed August 31, 1998, projects that the unsecured creditors will recover 72 percent of the amount of their claims under the Plan, less than the full value of their claims. Nonetheless, the Plan provides for the owners of the Debtor to retain their interest in the Debtor. Although the Debtor argued during the hearing that no distribution will be made to the Debtor's owners until and unless all Creditors are paid in full, that argument is irrelevant. An equity holder may not retain even a worthless interest in the Debtor where the Creditors' claims are not satisfied under § 1129(B)(2)(B)(i). *Norwest*, 108 S.Ct. at 965-66.

Additionally, although a number of Courts recognize the existence of the so-called "new value" exception to the absolute priority rule, that exception does not apply here. *See In re SM 104, Ltd.*, 160 B.R. 202, 221 (Bankr. S.D. Fla. 1993) (recognizing validity of the new value exception); *but see In re Lumber Exch. Ltd. Partnership*, 125 B.R. 1000 1007-08 (Bankr. D.Minn. 1991) (rejecting the existence of the new value exception). According to the new value doctrine, "participation by prepetition owners without full payment to creditors would not violate the absolute priority rule if: (1) the prepetition owners made a fresh contribution; (2) in money or money's worth; (3) that was reasonably equivalent to the participation accorded those owners; and (4) that was necessary for an feasible reorganization." *SM 104, Ltd.*, 106 B.R. at 221. The

6

contribution of future labor and management skills are not new value, because they are not money or money's worth. *Norwest*, 108 S.Ct. at 967. Even if the new value exception exists, the Debtor has not shown it to be applicable in this case. On the contrary, the Plan provides for Ms. Stam and her family to retain their interest in the Debtor without contributing any additional money or property whatsoever. In fact, the Plan provides for Ms. Stam to be paid for her management services, both past and future. Due to the violation of the absolute priority rule, the Plan is not confirmable. Accordingly, the Court will not approve the disclosure statement.

### B. Reconversion or Appointment of a Chapter 11 Trustee

South Henry has moved for the reconversion of the case to Chapter 7, or, in the alternative, appointment of a Chapter 11 Trustee. The Code provides that an Chapter 11 Trustee may be appointed where "such appointment is in the interest of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). The appointment of a Trustee is appropriate where conflict between the creditors and the debtor has extended "beyond the healthy conflicts that always exist between debtor and creditor." *In re Marvel Entertainment Group*, 140 F.3d 463, 472 (3d Cir. 1998). Similarly, courts have allowed the appointment of a Chapter 11 Trustee in instances where the creditors lack confidence in the debtor's ability to reorganize. *See In re Madison Management Group, Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992); *In re Colorado-Ute Elec. Assoc.*, 120 B.R. 164, 175-76 (Bankr. D. Colo. 1990); *In re Cardinal Indus., Inc.*, 109 B.R. 755, 767 (Bankr. S.D. Oh. 1990).

The Debtor has serious disagreements with its largest secured lender and its potentially largest unsecured Creditor. The Debtor and the Creditors "have flung accusations at each other and have failed to demonstrate any ability to resolve matters cooperatively." *Marvel*, 140 F.3d at 473. In the present case, a level of acrimony between the Debtor and Creditors exists that

7

AO 72A
(Rev.8/82)

exceeds the normal level of inherent conflict that typically exists in bankruptcy cases. The Debtor blames its Creditors, South Henry and Killearn, for the failure of its prior attempts to develop the property. While the Court expresses no opinion on the assignment of fault in the matter of the failed joint ventures, it does appear to the Court that Ms. Stam harbors such bitter feelings against these Creditors as is likely to cloud her judgment. To make matters worse, Ms. Stam has two fairly substantial claims against the Debtor. *See Marvel*, 140 F.3d at 473 (conflict arose where insiders were "in an awkward position of evaluating their own . . . debt claims" against the debtor).

Furthermore, the Creditors have expressed a lack of confidence in the Debtor's ability to reorganize. Some of this is no doubt a result of the acrimony among the parties, but even Creditors who do not have such disputes with the Debtor, such as Brownstone and RJM, have expressed misgivings about the reorganization. In fact, only one creditor other than Ms. Stam has expressed support for the Debtors efforts to reorganize. Further, it appears that the Creditors' doubts are well-founded, because, as outlined above, the Plan is vague and optimistic.

The Court believes that appointing a Trustee would work to the benefit of the Creditors *and* the equity holders. The equity holders will not benefit from the depletion of the estate resulting from endless litigation that is incapable of settlement due to the acrimony between the parties. A Trustee would be able to pursue the Debtor's claims more objectively, and the Creditors will respond to a third party with greater objectivity as well. Appointing a Trustee would be beneficial for many of the same reasons identified in *Cardinal Indus*.

> The Court believes the interests of all parties to these cases will be served by the presence of an independent trustee. The presence of a trustee will provide secured creditors . . . with an objective party to decide whether to keep, sell or abandon particular assets. Unsecured creditors will have a party who is sensitive to the fiduciary duties owed to all constituencies. . . . Potential purchasers of assets of Cardinal or its affiliated partnerships

8

will have a disinterested and dispassionate party on the other side of the negotiating table. . . . And finally, if the right person is selected, the Court will have an objective and realistic party to determine whether there is an estate of sufficient value to justify the time and resources expended on these cases.

*Cardinal*, 109 B.R. at 766. In the instant case, these same factors weigh in favor of appointing a Chapter 11 Trustee.

Accordingly,

**IT IS THE ORDER OF THE COURT** that the Debtor's disclosure statement is inadequate and is disapproved, and the Plan as it stands will not be confirmed.

**IT IS THE FURTHER ORDER OF THE COURT** that a Chapter 11 Trustee will be appointed by the U.S. Trustee as soon as practicable.

The Clerk is hereby **directed** to serve a copy of this Order on the Debtor, Debtor's counsel, and all Creditors and parties in interest.

**IT IS SO ORDERED.**

At Atlanta, Georgia, this 22nd day of September, 1998.

_____
A. D. KAHN
UNITED STATES BANKRUPTCY JUDGE

9

AO 72A
(Rev.8/82)